Calling case 13-2643, Robert Carlson v. Scott Fewins et al. Oral argument not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. Mark Roy Bender for the appellant. Good morning and may it please the court, Mark Bender on behalf of the plaintiff appellant, the estate of Craig Carlson. If I may, I'd like to reserve three minutes for rebuttal. As the court is aware, this is a tragic case of a man killed by the police. We have raised four issues, two of them summary judgment issues and two of them trial error issues. I'd like to touch very briefly on all of them, but if there are any particular issues that attract the court's attention, I'd encourage questions that would allow me to focus on that. We begin with the summary judgment given to Mr. Derslicki, the commander of the ERT. Everybody has seemed to focus on whether he ordered Jetter to shoot and kill, and we acknowledge that he did not express the order. The problem is that the Hayes case sets a broader standard that is implicitly encouraging or authorizing. The summary judgment facts viewed favorably to the plaintiff indicate that before any of this so-called pointing and confrontation is taking place, Derslicki is already talking about lethal force. When can we kill the guy? He then asks Jetter, can you see him? Do you have a shot at him? No. He authorizes Jetter to move. Why are you going to move? So you can shoot at him. Before Jetter has seen what he claims to be the threatening conduct, he's already moving for the very purpose of being able to shoot and kill. And within seconds, the fatal shot is fired. We contend that at least a reasonable jury could conclude that by discussing lethal force beforehand and authorizing a move for the express purpose of shooting, he is at least implicitly authorizing the fatal shot. We then get to the summary judgment on what I regard as independent Fourth Amendment grounds. The onslaught onto the property by up to 60 officers, breaking every window in his house with tear gas canisters, puncturing the tires on his car, and all these other activities. We've raised two independent grounds. One is there is no probable cause, and that should be the end of the story. And the second arrow to that quiver, if you will, is there are no exigent circumstances for bypassing the warrant requirement. At the outset, when you have the first two officers arriving at the scene, they have decided, for reasons which they deem good to themselves and I've got no problem with, that they do not want to physically engage Mr. Carlson. They don't want to have the sit-down that had fruitfully taken place previously that week. That's a permissible law enforcement decision, and perhaps a reasonable one. But then they start what looks like window-peeping to look in through the shades, see that the lights are on, and they see him loading a gun, which may be somewhat frightful, but is Second Amendment-protected activity. What are they doing on the property window-peeping in the first place? And then what are they doing puncturing tires, canisters, destroying his windows, and everything else? The only thing they can point to occurs after all of this has already started, when he aimlessly fires into the woods. That happens after the initiation of what we claim to be Fourth Amendment-violative conduct by the police. And you certainly can't authorize or justify a search by what happens after the search is already underway. And indeed, the irony of all of this is they kill the man because the police are threatened by him, and the reason they're threatened by him is the unlawful intrusion in the first place. So we have argued that there should be reversal of that summary judgment. It's an independent issue, and interestingly, that is what he is complaining about early in the morning when he is killed, when he threatens to sue for the property damage. Counsel, are you familiar with this case argued in the Supreme Court last month, I believe it was, Sheehan v. San Francisco, where they've got a very similar problem of what the standard should be She was mentally ill and they shot her, and the lower court in the case ruled that the case should go to the jury, and the Supreme Court has now taken a certiorari of that. Are you familiar with that case? I am unaware of that. I apologize for that. Unaware. And I don't know how the facts might coincide, although it occurs to me here It's the mentally ill, the problem of how the police should deal with the mentally ill situation where a mentally ill person is somewhat of a danger to the community, or in general, as in this case, and whether the police should wait, or whether they may intervene immediately, or when they can intervene. I understand the vexing problems that we impose upon police, a variety of different functions. And here, two of the officers had previously performed what was basically a mental health type function, talking to him, talking through his problems, and it worked very successfully. But I appreciate the problems that the police have. The difficulty in this case is that he is not threatening anybody until the police intrusion itself. This is unlike the Bing case where you've already taken a shot at neighbors or something. The reason the police came was because of a call from his family. It sounds like it. It says there had been... They get a call, basically a welfare check-up, if you will. Then the police say, no, we're worried about your activity, don't interact with him. Don't go in the house, that sort of thing. The first two people arrive, and they don't talk to him, they don't intervene with him, they look in his windows. At that point, because they see he's racking up a gun or has put bullets in it, that's what initiates the onslaught of a total of 58 more officers, the tear gas and all of that. But the irony of all of this is... He is saying that he's going to kill somebody. Pardon me? Doesn't he make the statement, they say, that he's going to kill somebody if they intervene? There is testimony to the effect that he is concerned about suicide by police. That if the police come and interact with him, he may do something that causes them to kill him. But if you think about it, what sense does it make, if you're trying to prevent suicide by police, not to simply leave him alone so there's no police in his sight? Well, the problem I have in the case is, what is the standard in these mental illness cases? We know that the standard in a fleeing felon case is not this case. So, what is the standard here? I would probably concede that police can do some things to help the mentally ill that they might not be able to do with other people. The problem is, it seems to me irrational to believe that puncturing his car tires is going to help his mental health situation, or intruding his house by breaking every window with tear grass canisters is rationally related to that. Yes, I understand that you are making a factual argument here that is the type you would try to offer if you got a trial. What I'm wondering is, what would be the standard that the judge should charge the jury is the standard for police conduct in this kind of case? I think it ultimately boils down to traditional Fourth Amendment standards. Do you have probable cause to believe that a crime has been committed, or do you create some new lower-than-probable-cause standard? If you go there, what are you entitled to do? Doesn't it have to be logically related to the role of protecting the mentally ill person himself, or at least those who are already in danger, rather than creating the danger yourself? That's the line I would suggest. You mentioned, I guess rhetorically, why would the police show up and stay there when he's just simply inside the house with guns and ammunition, but I thought that the record reflected that there was a concern about neighbors. The neighbors had already been removed. Right, so some neighbors were evacuated, apparently one neighbor was in a wheelchair who was not able to be moved. But he never threatened neighbors, never shot at neighbors, never did anything that would justify probable cause to believe he was going to kill neighbors. There's no evidence of that. Was there not some shot out the back door or something? According to the testimony, he may not have even realized that police were there. It was an aimless shot in the woods in his own backyard that they believed was an attempt to draw attention. That's what it was. The other two issues, of course, are the exclusion of an argument to the effect that the policy could be considered as circumstantial evidence of what is objectively unreasonable conduct. And that's a broad standard, there's no question about it. And likewise, the evidentiary standard of relevancy is broad. But I think the trial court and defendants confuse the question of what is the constitutional standard with what is admissible relevant evidence under FRE 401. And in this particular case, it was critical to be able to show not only that the defense witnesses were wrong when they say he was following policy, but that the policy itself, which was taken almost verbatim from Garner, is one that is circumstantial evidence of reasonableness, particularly the warning in advance before you kill somebody. My time is up, I see, and I'll be glad to address the rest of it on. Thank you. Good morning, Your Honors. I'm Chris Cook. I'm the attorney for the defendants Charlie Jetter, Sgt. Fewins, Sheriff Fewins, and Grand Traverse County. I have reserved five minutes for co-counsel to address the court as to Captain Drzewicki's conduct. It's my pleasure to be here. I am the attorney who handled this case from its inception in November of 2007. I did the discovery and litigated the case and wrote the appellate brief. I've only been in front of this bench three times in my 30-year career, and it's a pleasure to be here to discuss this with you. I think what's frustrating, though, for me is to get to this level of review and have the facts distorted so terribly on the record that they are contrived to support arguments by the plaintiff appellant. So I labored in my submission, and I'll be happy to discuss all these facts with the court as we have time today, to identify the factual record that was presented to both Judge Maloney at the time he made his rulings and to the jury at the time they decided that Deputy Jetter had not violated the constitutional rights of Mr. Carlson. And first and foremost... One of the first questions is, what is the standard under the Fourth Amendment for dealing with the mentally ill type person, as this person clearly was known to be, who was apparently threatening suicide or suicide by police or that kind of thing? The standard seems none too clear to me what it is. My response, Your Honor, is that the Fourth Amendment standard doesn't vary depending on the mental condition of the individual. I don't think the Constitution identifies different rights under the Fourth Amendment depending on who that person is who, in this situation, has armed himself with a specific intent to lure police officers on to his property to shoot one. I think we have to make clear about our record, though. We did not, Grant Travers County, Sheriff Jetter... I'm assuming facts. What leads you to the conclusion that he sought to get the police to come and do these things? That's why the record's important, Your Honor. He told his sister and he told his brother, November 2nd and November 3rd, after our officers came to his home and tried to get him committed to Center One, and he told them he was not mentally ill, not suicidal, and not depressed, and so we couldn't commit him to Center One. He then went out and bought a prepaid funeral. He called his brother and sister and said he's going to get in a shootout with the police and end it in a blaze of glory. He equipped himself. He already had in his house an AR-15. He had a Tech-9. He had about 15 rifles. He had 2,000 rounds of ammunition, and he specifically told his brother and sister that's what he was going to do. When he called 911 on November 9th, he wasn't doing it to seek some assistance from the police. He'd already told his sister and his employer, Mike Walton, that tonight's the night I end it. I'm going to bring some police officers in here. I'm going to lure them into the house, point a gun at them. It might be loaded or unloaded. I'm going to engage them in a shootout and go out in a blaze of glory. That's the record of the 911 calls. That's not mental illness? Well, I think that he was mentally ill, but the police officers aren't the ones that are in a position to have to judge that at that point in time. What they're in a position of judging is is this man a clear and present danger to the neighborhood or themselves or the police officers. When they got to the scene, when Justin Revnell and Deputy Opper got to the scene in response to the second phone call... Are you saying that his apparent mental illness is not one of the circumstances under the Fourth Amendment that should be taken into account in deciding about what's reasonable? I think in this particular scenario, his mental state when he appeared at the window with that AR-15 is not something that the police officers should be charged with understanding. We did make many efforts to communicate with him. That wasn't my question. My question is in light of what the police knew about his mental state, should not that be taken into account in determining what is reasonable under the Fourth Amendment? I think we did take those facts into account when we dealt with it. You would agree that they should have done that? I agree that we did what we should have done when it comes to dealing with Mr. Carlson. We did try a number of non-lethal efforts to bring him out of the house. He was barricaded in the house with a lot of weapons. We tried to talk to him. We brought in a professional negotiator. That lasted for about six hours before he said he's not talking to us anymore. All the time continuing to make threats. The probable cause here was what exactly? The probable cause was his desire to lure the police officers into his home and engage them in a shootout and load his weapons to either commit a gunfight with the police or kill himself. This is a neighborhood that's very close to a music academy where there's 250 young students who attend there who live in those dormitories. So the police had to respond to that information and do what they did to prevent a scenario where he might turn into an active shooter. We couldn't simply have ignored it under these circumstances, particularly when we had had a number of occasions to interact with him where we were concerned about his mental stability and we were concerned about his access to weapons. Then we got these phone calls from his brother and his sister who specifically told us not to go in that house because he's going to try to shoot one of the police officers. So when we got to the scene, and by the way, this observation wasn't a peeping Tom situation, his windows were wide open, he had lights on the house, it was lit up like an airport was the testimony. And from the street, the officers could see Mr. Carlson in the basement frantically loading his weapons. At the point in time where they got, two other officers arrived and they cordoned off the area, because this is a neighborhood, they cordoned off the area to make sure he couldn't escape. That's when he fired the shot out the back door. That happened very close in time to the arrival of the police officers on the scene. At the same time, our 911 dispatcher, Pat Andresen, is calling him and talking to him on the phone and he's saying, well I just want a police officer to come into the house, I'm not going to hurt anybody, I need to talk to somebody, I've got coffee and I've got beer waiting for him, just have him come in the door. And Andresen is getting information that Carlson is discharging a gun out the back door and Carlson is denying that he's armed. He says, I'm 100% unarmed, this isn't going to be a standoff, this isn't going to be a shootout. So he's engaging in specific efforts to try to lure a police officer into the home to shoot at him or shoot him so he can get into a shootout and go out in a blaze of glory. So we had to react to that danger, present danger, to the neighborhood from this individual who was heavily armed. What's the closest house in this neighborhood? Is this in the middle of nowhere? No, Your Honor. I'm sorry. A subdivision? This is in Interlochen, which although it's a heavily treed area, it's a suburban area, and the house next door, I heard the baseball discussions earlier, you could throw a baseball and hit the house next door. It's probably 50 yards away. And there's houses immediately behind this area that's probably 125 yards away, and to the south side of the house another 50 yards away. So this is a heavily populated area, and while we had this area cordoned off, we also had to evacuate all these people from the surrounding homes, one of which was a man in a wheelchair who we couldn't evacuate, so we put him down in the basement. He and his wife stayed there throughout the whole evening within sound distance, hearing distance, of all this activity. All the neighborhood was evacuated, you're saying? Eventually all those neighbors were evacuated with the exception of the gentleman who was in the wheelchair, who was a next-door neighbor. He had to stay in the house. We couldn't evacuate him out of that house. So there was a real and present danger to the neighborhood from Carlson's activities. How many houses were evacuated? I'd say probably, I don't know the specific number, but in that area based on what I know about the case, probably 8 or 9 or 10 houses were evacuated in that area and traffic was prevented from coming down the road. That whole area was cordoned off. So there was a clear and present danger to the neighborhood from this, and the idea that Mr. Carlson himself, if he didn't respond to that request, that a police officer respond to his home so he could interact with that police officer, there's quite a high potential, we had testimony in the trial, that he could become an active shooter. We called two police procedures experts to the stand, Ron McCarthy and Robert Parsons, both of whom are highly qualified, and testified that you have to respond to that kind of a scenario because if you don't, you invite someone to get into their car and drive over to Interlochen Academy. I have a question. What is the reason for the distinction between DeWicke, for example, I know your co-counsel is going to argue that case, and these other police officers who were in charge, some re-judgment for them in trying the case of Jeter, the sniper. The facts in the case indicate that DeWicke and other leaders said to the sniper certain things about shooting and shooting to kill. Maybe there's a debate about what exactly was said. But anyway, why do we say that there is a trial for the sniper, but not for the leaders who told the sniper what to do? Judge Maloney, now here's the important part of the factual record. DeWicke never ordered, there was no shoot to kill order ever given. Jeter testified to that, DeWicke testified to that, there simply wasn't. Jeter reacted to the threat he saw at the time he discharged his weapon, that's clear. What Judge Maloney ruled is that the plaintiff had created some factual issues about where different police officers were located outside of the home,  and Judge Maloney ruled as to what Deputy Jeter did in using the lethal force, there were fact questions as to these different issues that allowed for a jury trial. You're saying there are no fact issues with regard to those leaders who were giving instructions to Jeter? I say there's no factual issue. Your Honor, I took the position there's no factual issue as to what Deputy Jeter did, but Judge Maloney didn't agree with that. Certainly there's no factual issue that's been raised by the plaintiff that would suggest DeWicke gave some shoot to kill order, or any of the commanders did. And there's no unconstitutional policy. The claim as I understand it is that DeWicke told, encouraged him to think along the lines of shooting to kill, which I thought was what snipers did, but that aside, that he asked him if he had a clear shot, that he told him to be moving around. What is the actual record evidence with regard to that? The actual record evidence, Your Honor, is that Jeter got out of the command post to warm up and replace the sniper who was on the one side, on the road side of the house. And as he's running down the road, he hears in his MEPS transmitter Travis Chellis, who's on the tree line, and he's pinned down by Carlson, who has an AR-15 trained on that group 50 yards away. Chellis is trying to talk Carlson down, and at the same time saying, I'm pinned down, I don't have a shot. One guy had a beanbag gun. None of those guys had a shot at Carlson. And he's asking for eyes and long glass. He's asking for a sniper. So DeWicke is trying to figure out where Chellis is, because Chellis had started running down the road to replace the sniper that had come in. Chellis had taken the position that the previous marksman had, which was looking at the door. The thought was, if Carlson tries to make a break for the door, I've got that covered, Jetter could not see the window. So Jetter got up and moved to where he could see the window. He wasn't moving to where he could get a shot. He was moving where he could see the window. What is DeWicke's part in all of that? DeWicke was at a command post 500 feet away and was communicating on the radio as best he could and actually hearing more than he was giving direction. I think at one point he said, do you have a shot? Because Chellis is yelling that we're pinned down and that we need help and we need long glass, but do you have a shot from your location is different than take a shot. That's what DeWicke says to the sniper. Do you have a shot from where you are? Yes, yes, and Jetter had to get up and move. But Jetter's testimony is clear. Jetter got up and moved after that to get in a position to have a shot. Jetter got up and moved so he could guard the window and see what was happening. He couldn't see what was happening from where he was located. Jetter reacted to Carlson, what Carlson did at the moment just prior to the shot. Sniper McAuliffe on the south side had to check his rifle after the shot was discharged because he thought he had discharged his rifle. This might be a perfect time to hear from Ms. Masseron as to DeWicke. Thank you. May it please the Court, Mary Masseron on behalf of the defendant Napoli, Sergeant DeWicke. A couple of things. Your Honor asked about the standard, and I agree with co-counsel. The standard under the Fourth Amendment is reasonableness under all the circumstances. The standard is the same. Certainly part of all the circumstances would be the information that the officers had in a very fast-moving situation. Here, I don't know that mental illness per se is something they knew, but they knew this was a person who had a history of problems and had called for help. More importantly, as co-counsel said, they had received calls from family members saying very specifically, he's heavily armed, he has guns hidden all over the house. He wanted to commit suicide, he said. Or to take someone else out. It was very clear that the family thought either he would provoke someone into shooting him or he would shoot himself, and they were concerned. The police told his family, don't talk to him anymore. Is that correct? As I understand the record, his family had a number of calls, various people had calls. There is a statement at some point in the record that somewhere through, someone said to the family, don't call anymore. Someone being a police officer? I'm not clear who made that assertion, so I don't want to. The family did not try to call him or talk to him any longer because of this so-called instruction? That's as I understand it. I think it's important when thinking about the Fourth Amendment standard here, and then I want to get back to the supervisory claim a little more specifically if I could, to keep in mind that the fact that someone has mental illness or is suicidal is something that we might say, let's take that in mitigation of the blame we might fix on someone, but it in no way lessens or underscores the danger. In this case, the Supreme Court just had argued, which is directly on this point of the circumstance of mental illness and what the standard should be under the Fourth Amendment. I wish I had read the oral argument transcript. I'm aware that the case is there, and I have my thoughts on where the court is going to go, but I did not have the opportunity to read the argument, which obviously would have been... We can see where the court does go on this question of what the officer's standard should be with regard to intervening in these mental illness problems. The court certainly may want to do that, and I would think that would be a reasonable thing. With respect to Drzewicki and the supervisory liability claim, it won't make a difference because the standard there is that you have to have authorized the conduct or acquiesced in it, and the record here is very clear that Sergeant Drzewicki did not authorize a lethal shot. He says he didn't. The shooter says he didn't. The record testimony shows that he didn't. What he did do... He said, are you in position to shoot to the jetter? Correct. That would sort of indicate an expectation of shooting, wouldn't it? No, I don't believe so, respectfully, Your Honor. What it would indicate is when you have some officer within range of a dangerous armed person whose family has warned you is looking to provoke and whose family has warned you is dangerous to the officers and who you can see is dangerous, it's very important to have other officers covering those officers who are close enough to be within shooting range, as Chellis was. Chellis was trying to talk with Carlson. He was, again, trying, as the whole troop of officers were trying over an extended period, to try to get a resolution by calming Carlson down, by trying to talk with him, by trying to get the situation resolved. Consequently, he was within shooting range. There's a dispute of inferences here. The inference you're making is no, that there was no suggestion of any kind that the sniper shoot by saying are you in position to shoot, but there is another inference that someone could make that this was an authorization and an implicit suggestion to get in position to shoot this fellow. I'm just saying that that is a conflict in inferences that a fact finder could draw. I don't believe so, Your Honor. And here's the reason why, because the statement itself is do you have a shot. It's very clear from the fact that the officers are there and that they've been instructed and they have policies with respect to lethal force that they are authorized to use lethal force under the constitutional standard when there is an imminent danger. And the fact that the sergeant said do you have a shot is in no way suggesting the shot be taken. They've all agreed, the policies have agreed, the statements have been agreed, that you don't take a shot unless you perceive there to be imminent danger. And, in fact, I think the record here shows admirable restraint. The officers tried over extended periods. The family had spoken with Carlson. A skilled negotiator was brought in to speak with Carlson. Chellis was trying to speak with Carlson. That's why he was up close. A skilled negotiator, who was that again? Eiling, Eiling, I'm not sure how to pronounce his name, A-Y-L-I-N-G. What did he do exactly? He was there earlier in the evening. He made a number of telephone calls and engaged Carlson on the phone over an extended period. Eventually Carlson stopped answering the calls and refused to speak with him. Then later a throw phone was thrown in and they tried again to engage with Carlson. Chellis was trying verbally to engage with Carlson. So the officers were trying in every way possible to diffuse what was an incredibly dangerous situation and the kind of situation we've all read in the press where it doesn't end in this way but ends in some conflagration where lots of people end up shot. That's what the officers were trying to effectuate. And for Drzewicki to say, do you have a shot when another officer is within shooting range of someone who's already shot out the door, whose family has given these warnings, that is in no way saying take a shot when there isn't imminent danger. It's saying get in a position to protect Chellis, to protect the people who are here in a situation of danger. That's what the words say. That's the way Drzewicki understood it. That's the way Jetter understood it. He took his shot shortly thereafter. And the original summary judgment motion was denied because there was a dispute about whether when he took that shot Carlson was leaning out the window and had holstered the rifle. Jetter said he did, and the plaintiff argued that the evidence didn't support that. So then we had an entire trial during which the jury heard all of this testimony, and the jury concluded the force used was reasonable. So from Drzewicki's point of view, the summary judgment was correct, but certainly an alternate ground in support of the judgment is the fact that if the force used was constitutional under the Fourth Amendment, then there is no supervisory liability, and that's the Heller case. Thank you, Ms. Messer. Your red light's been on for a while. I appreciate the extra time. We have questions. Thank you. Thank you. Thank you. We get back to the Fourth Amendment question that I didn't see answered by the defendant. What crime was there probable cause to believe that he had committed? We're told that he had expressed through others a thought to engineer his own death and that he might provoke police if they would be on his property. That's not a crime. It may be a very foul thought, but thinking is not a crime. But more importantly, their reaction... Well, threatening may be a crime, though. Telling... It may be marginal, I guess, but if you're simply saying, if police come, then I will threaten them in the hope that they kill me, I'm not sure whether that's a crime. I may kill them. He never... I don't think he ever threatens to kill the police except threatening in a way that will result in his own demise. Certainly, though, there is no evidence of any threat to engage anybody else other than police and himself. We've talked about... Both sides obviously have very different views of the facts, and I understand that. The problem is the way the summary judgment ruling shaped the trial in which those facts were presented, where the case was allowed to focus exclusively on what happened in a couple of seconds when Jetter says, contrary to blood splatter and other evidence, that he was pointing out the door with his hand on the trigger, even though the blood splatter's not there where it would be. But all of that aside, it's shaped by the summary judgment rulings, which bring... which take out of the equation everything leading up to this, including what I claim to be the independent Fourth Amendment, and is also shaped by the trial rulings, which don't allow us to argue based on the policy that he failed to give a warning, and also the spoliation of evidence that would be so critical. Now we... I haven't argued that, and I won't on rebuttal, other than to note that those are the reasons why we have disputed issues of fact that aren't being fairly presented. And so it seems to me that the summary judgment decisions and the trial rulings work together and end up skewing the nature of the presentation, and for that reason, we'd ask the court to reverse. Thank you very much. Okay, thank you, counsel, again, all of you, for your arguments today.